IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
JUN 20 2003
Michael N. Milby, Clerk

| | | |
|---|---|---|
| RHONDA H. WILLS, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Civil Action No. H-03-2195 |
| | § | |
| VINSON & ELKINS L.L.P., | § | |
| | § | Jury Demanded |
| Defendant | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF THE UNITED STATES DISTRICT COURT:

COMES NOW, Rhonda H. Wills ("Plaintiff"), Plaintiff in the above-referenced cause, and files this Original Complaint against Defendant, Vinson & Elkins L.L.P. ("V&E" or "Defendant"), and in support thereof would respectfully show the following:

**I.**
**PARTIES**

1. Plaintiff, RHONDA H. WILLS, is an individual who is a citizen of the United States and the State of Texas, and resides in Fort Bend County, Texas.

2. Defendant, VINSON & ELKINS L.L.P., is a Texas limited liability partnership and operates as a law firm. Defendant may be served with process by serving Joseph C. Dilg, its managing partner, at 1001 Fannin Street, 2300 First City Tower, Houston, Texas 77002.

## II.
## JURISDICTION

3. This Court has jurisdiction over this lawsuit under 42 U.S.C. § 1981 as amended by the Civil Rights Act of 1991 ("42 U.S.C. § 1981") because the nature of this action is to correct unlawful employment practices on the basis of race.

## III.
## ADMINISTRATIVE PROCEDURES

4. There are no administrative procedures or other conditions precedent to filing this cause of action pursuant to 42 U.S.C. § 1981 Plaintiff has timely filed a charge of sexual harassment (both *quid pro quo* and hostile environment), gender discrimination and retaliation on the basis of gender under Title VII, 42 U.S.C. § 2000e with the Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights. When a final decision is rendered or a right to sue letter is issued by the EEOC, Plaintiff will seek leave of court to amend this complaint to add additional counts for sexual harassment, gender discrimination and retaliation.

## IV.
## FACTS

### BACKGROUND

5. Plaintiff is an African-American woman. Plaintiff was employed continuously by Defendant V&E as a full-time associate attorney from August 7, 1995 through April 25, 2003.

6. Plaintiff graduated as valedictorian from Winona High School in 1987, and graduated from the University of Texas at Austin with a B.B.A. in International

Business and Marketing in 1991. Plaintiff entered the University of Texas School of Law in the Fall of 1991.

7. Plaintiff spent the summer following her second year of law school working at three law firms in Houston, including V&E. Plaintiff received permanent job offers from all three firms. While working as a summer associate at V&E during the summer of 1993, Plaintiff worked in both the General Litigation and Labor & Employment sections of the Houston office. Plaintiff was extended an offer to work in either section, and Plaintiff accepted V&E's offer of permanent employment to work in the General Litigation Section.

8. Plaintiff graduated from the University of Texas School of Law in 1994 and immediately clerked for one year as a Briefing Attorney for the Texas Supreme Court. Following the completion of her judicial clerkship, she began her employment with V&E in its Houston office on August 7, 1995 as an associate attorney. As was its custom, V&E gave Plaintiff one year of partnership credit for completing the judicial clerkship.

9. Defendant V&E is an international law firm with over 850 lawyers in eight domestic and international offices. Its headquarters are in Houston, Texas. It is one of the largest and oldest law firms in Texas. V&E was established in 1917.

10. V&E is governed by a management committee, which makes business decisions for the firm, including recommendations for partnership. The committee is chaired by a managing partner. Harry M. Reasoner ("Mr. Reasoner") served as managing partner until 2001, when Joseph C. Dilg ("Mr. Dilg") assumed the role.

11. When Plaintiff began working at V&E in 1995, the Houston office had three litigation sections, including General Litigation, Tort Litigation and Business Litigation. Each litigation section operated individually with separate section heads, budgets, clients, evaluations of section associates and divisions of work.

12. The General Litigation Section was headed by three senior partners: D. Gibson Walton ("Mr. Walton"), H. Ronald Welsh ("Mr. Welsh"), and Robert M. Schick ("Mr. Schick"). These individuals were in charge of the General Litigation Section and determined the policies and procedures that governed the section. The partners in the General Litigation Section were responsible for preparing year-end evaluations of the associates with whom they worked. Mr. Walton, Mr. Welsh, and Mr. Schick were responsible for conveying the results of those annual evaluations to the associates in the section.

13. By 1999, the three Houston litigation sections merged into a single, consolidated section with three section heads, including David T. Harvin ("Mr. Harvin"), Mr. Walton and Mr. Schick.

14. Like many new young associates, Plaintiff arrived at the ivory towers of V&E full of ambition and optimism. She was determined to work hard and succeed by overcoming any and every hurdle. By the time Plaintiff left the employment of V&E on April 25, 2003, those dreams had been shattered as she faced not a glass ceiling, but a brick wall.

## HISTORY OF RACE DISCRIMINATION

15. Defendant has a history of racial discrimination in its hiring, retention and promotion of African-Americans. The first African-American lawyer to be considered

for partnership at V&E, Sherman E. Stimley ("Mr. Stimley"), was repeatedly denied a partnership. Mr. Stimley eventually left the firm to start a solo practice.

16. After Mr. Reasoner became managing partner at V&E, two black lawyers rose through the firm to be admitted into its partnership ranks. Neither remains at the firm today. They remain the only African-Americans to ever ascend through the ranks at V&E to become members of the firm.

17. Under the leadership of Mr. Reasoner, V&E appeared to make a sincere effort at diversity. When Mr. Dilg began managing the firm, diversity became more of a marketing tool to garner business than a genuine effort.

18. During Plaintiff's employment at V&E, there were instances of the use of the firm email system to distribute racist email messages. Moreover, racist jokes were tolerated by senior partners at V&E.

19. Plaintiff was subjected to racially offensive comments and behavior throughout her employment at V&E. On or about October 24, 2002, Plaintiff attended a client development dinner with other V&E attorneys. While at dinner, Phillip Dye ("Mr. Dye"), a V&E partner from the Houston Litigation Section, told a racially insensitive story while laughing and joking. Other senior V&E partners, as well as clients, were seated at the dinner table. Mr. Dye was seated directly next to Plaintiff. In order to illustrate part of the racist story, Mr. Dye touched Plaintiff's face saying "does this rub off?"—a reference to whether Plaintiff's skin coloring "rubs off."

20. Similarly, a V&E partner from the Intellectual Property Section, Karen White ("Ms. White"), repeatedly used the term "quota hire" to describe an African-American executive employed by one of the firm's clients. Plaintiff complained to David

H. Brown ("Mr. Brown"), Mr. Harvin and Mr. Schick regarding Ms. White's racially insensitive comments. Plaintiff also reported to Mr. Brown that Ms. White was over-billing the same client—a public entity—and mishandling the client's case to the point of committing possible legal malpractice. Mr. Brown told Ms. White about Plaintiff's complaints, and Ms. White wrote a negative evaluation regarding Plaintiff's work in retaliation for Plaintiff's complaints.

21. The outlook for black lawyers at V&E to ascend through the firm ranks into its partnership is bleak, particularly now that Mr. Reasoner is no longer managing partner.

22. Currently, there is only one black lawyer employed by V&E who has been with the firm for more than four years. Moreover, there is only one black associate on partnership track in the entire Houston Litigation Section, which has more than 100 lawyers.

23. When Plaintiff was considered for partnership in November 2002, she became only the fourth African-American in the 85 year history of V&E to rise through the ranks to be considered for partnership. Like Mr. Stimley before her, Plaintiff was denied partnership.

## GENDER DISCRIMINATION AND "THE MOMMY TRACK"

24. Plaintiff and her husband had two children while Plaintiff was employed at V&E during the years 1998 and 2002. Despite prior assurances, Plaintiff was penalized in the partnership process for taking a firm permitted 12-week maternity leave during each of her pregnancies.

25. V&E has instituted a Women's Initiative program ("Women's Initiative"), which purports to ensure that women will be given an equal opportunity at advancement. The Women's Initiative has a board comprised of various women clients and V&E lawyers. V&E uses the Women's Initiative as an opportunity to forge close relationships with powerful women clients.

26. While V&E pays "lip service" to its clients, in reality the Women's Initiative has done little to help women associates achieve an equitable position at V&E, particularly in the Houston Litigation Section.

27. The Houston Litigation Section is a hostile environment for women attorneys. During Plaintiff's employment at V&E, there were instances of the use of the firm email system to distribute sexist email messages. Moreover, sexist jokes were tolerated by senior partners at V&E.

28. The Houston Litigation Section and its predecessor the General Litigation Section, historically have failed to give women leadership roles. The Houston Litigation Section is dominated by and controlled by men.

29. The Houston Litigation Section and its predecessor the General Litigation Section, historically also have failed to promote a woman who has a baby and takes maternity leave *before* being considered for partner. Those women are typically placed on "The Mommy Track" and are encouraged to practice part-time (which removes them from partnership track), to move to an alternative career track (a demotion that also removes them from partnership track), or to simply stay at home with their children.

30. Plaintiff experienced several insensitive comments regarding her role as a working mother. Plaintiff was told by partners in the Houston Litigation Section that she

should spend more time with her "young children." Plaintiff never worked on a part-time schedule. Plaintiff was questioned by partners in the Houston Litigation Section about her ability to be a good mother while continuing to work as a full-time litigator.

31. After giving birth to her second child in 2002, Mr. Harvin told Plaintiff that she should not have any more children. He advised her that she would have a difficult time being a successful litigator with more than two children.

32. Plaintiff had a baby on February 19, 2002, almost 9 months before being considered for partner. Plaintiff took only the customary maternity leave offered by V&E of 12 weeks of paid leave. Nonetheless, one of the reasons that V&E refused to make Plaintiff a partner was because she took maternity leave.

**SEXUAL HARASSMENT BY SECTION HEAD**

33. On Plaintiff's first day of work at V&E, she received her first work assignment from Mr. Welsh, one of the most powerful partners in the Houston General Litigation Section. Plaintiff had worked with Mr. Welsh as a summer associate. Moreover, Mr. Welsh had periodically corresponded with Plaintiff during her final year at law school and while she worked at the Texas Supreme Court. After the initial assignment, Plaintiff continued to work for Mr. Welsh on other work assignments.

34. Mr. Welsh became abusive in his treatment of Plaintiff. For example, Mr. Welsh would berate Plaintiff for any simple infraction, such as omitting a comma in a sentence. Plaintiff often sat in her office in tears after the emotional abuse that she suffered in order to continue to receive work assignments from Mr. Welsh.

35. Plaintiff continued to suffer the abusive and hostile work environment in silence until one day, in the Spring of 1997, the abuse became unbearable. Mr. Welsh

invited Plaintiff to lunch at a local restaurant on a business day to discuss her "career development at the firm." During the luncheon, Mr. Welsh ordered wine and made several lewd, personal, suggestive and inappropriate remarks regarding Plaintiff's "exotic appearance." Further, while at the restaurant, Mr. Welsh touched Plaintiff in a suggestive and inappropriate fashion. Mr. Welsh propositioned Plaintiff to engage in a sexual relationship with him. Mr. Welsh told Plaintiff that as a Senior Partner and Section Head that he would be able to help in her career development and continued success at V&E. Plaintiff rejected Mr. Welsh's advances and stopped working with him.

36. After being propositioned by Mr. Welsh, Plaintiff asked to be transferred to a different section, but was told to remain in the General Litigation Section.

37. Soon Plaintiff learned from another V&E lawyer that she was the subject of office rumors. Mr. Welsh spread rumors that he was having an affair with Plaintiff and disclosed his "sexual fantasies" about Plaintiff to other male attorneys in the firm. Plaintiff was humiliated by these malicious and false rumors.

38. It was well-known at V&E that Mr. Welsh has a reputation as a partner with a tendency to engage in inappropriate behavior and to sexually harass young, female attorneys. Like other senior partners at V&E who have also engaged in inappropriate sexual behavior with subordinate female employees, Mr. Welsh's conduct went unchallenged and without reprimand despite his pattern of such behavior.

39. Because of Mr. Welsh's harassment, Plaintiff lost valuable opportunities to work on high profile litigation matters because of her inability to work with Mr. Welsh.

40. When Plaintiff was considered for partnership in November 2002, Mr. Welsh obtained his ultimate revenge for her rejection of his sexual advances by using his influence to ensure that she was denied partnership at the firm.

**DENIAL OF PARTNERSHIP**

41. When Plaintiff received her associate evaluation in the end of the year in 2000 and at times prior to the year 2000, her evaluations were positive. Plaintiff was told year after year at each evaluation that she had "a great future" with the firm.

42. During the year-end evaluation for 2001, the only negative evaluation that Plaintiff received was from Ms. White, a partner in the Intellectual Property Section. The evaluations that Plaintiff received from Mr. Brown and Mr. Harvin were positive.

43. Plaintiff met with Mr. Dilg during the summer of 2002 and was assured that she was "highly valued and well-regarded" at the firm and that everything looked "great" for her partnership chances.

44. At the end of July 2002, Plaintiff submitted her partnership memorandum to the Partnership Admission Committee. When Plaintiff was considered for partnership in 2002, she became only the fourth black lawyer in the history of V&E to ascend through the ranks and be considered for partner.

45. In August 2002, Plaintiff was photographed for inclusion in V&E's Women's Initiative brochure. V&E mailed out the Women's Initiative brochure to thousands of clients, prospective clients, judges and other lawyers, approximately two weeks after Plaintiff was denied partnership.

46. In October 2002, just before being denied partnership, Plaintiff was also included in the V&E televised commercial on Continental Airlines.

47. On November 7, 2002, despite prior assurances, V&E informed Plaintiff that she did not make partner. The individual who did make partner from the Houston Litigation Section was a Caucasian male.

48. Mr. Harvin and Mr. Schick informed Plaintiff that she was not being promoted to partner because some partners in the Houston Litigation Section did not "feel comfortable" with her.

49. As part of the partnership evaluation process, partners in the Houston Litigation Section were interviewed regarding their opinions of Plaintiff as a partnership candidate. The comments attributed to Houston Litigation Section partners regarding Plaintiff were: "Rhonda doesn't know her place;" "Rhonda is uppity;" "Rhonda isn't friendly enough;" "Rhonda is too aggressive and arrogant;" "It would do Rhonda good to humble herself." These comments were purportedly made by partners in the section who had not worked with Plaintiff. Mr. Harvin and Mr. Dilg refused to tell Plaintiff which partners made the comments citing the secretive nature of the process.

50. Plaintiff also met with Mr. Walton to discuss the denial of partnership. During their conversation, Mr. Walton suggested to Plaintiff that she should consider staying at home with her two small children. Mr. Walton informed Plaintiff that there was little or no chance that she would ever become a partner at V&E. Mr. Walton also suggested to Plaintiff that she might consider working part-time if she insisted on working, but that she should concentrate on spending more time with her children.

51. During the meeting, Mr. Walton also informed Plaintiff that several partners did not like her attitude or the way she presented herself "as though she was important." Mr. Walton informed her that there was a feeling among partners in the

Houston Litigation Section that "she didn't know her place." Mr. Walton reminded Plaintiff that she should "remember that you are in the South, and there is an expectation that people behave a certain way here. You act like you're somewhere on the East Coast, like New York. The way you behave may be acceptable there, but we don't tolerate that here." Mr. Walton instructed Plaintiff to "humble herself." When questioned by Plaintiff about how she should "humble herself," Mr. Walton stated: "Aren't you from East Texas? Then I think you know exactly what I mean." During the meeting, Mr. Walton also made derogatory comments about other African-American and women lawyers at V&E.

52. Plaintiff also met with Mr. Dilg, the managing partner, to discuss the denial of partnership. Mr. Dilg told Plaintiff that he had given her assurances about her partnership chances before partners in the Houston Litigation Section were interviewed. Mr. Dilg stated that during this interview process, there were negative comments made about Plaintiff from some of the partners in the Houston Litigation Section, while some partners said positive things about her.

53. Mr. Dilg gave Plaintiff two options regarding her future at V&E: (1) she could be considered for partner again in two years, but there were no guarantees that she would ever be made a partner; or (2) she could be placed with a client in an in-house position. In order to be placed in an in-house position, Mr. Dilg instructed Plaintiff that she would have to agree to go along with a "story" that she chose to leave the firm and accept an in-house position in order to have more time to spend with her children. Mr. Dilg also insinuated that V&E would not provide positive references for Plaintiff to seek a job with another law firm.

54. Plaintiff repeatedly inquired about what she would need to do in order to become a partner. After Plaintiff did not receive any clear-cut answers, she was finally told V&E's "real method" for partnership selection.

55. On or about January 21, 2003, Plaintiff met with Mr. Harvin. Again, Plaintiff inquired about the objectives that she would need to reach in order to become a partner. Mr. Harvin told Plaintiff that she clearly did not understand the way that partnership works at V&E. Mr. Harvin told Plaintiff:

> "Being invited to be a member of this firm is like being invited to be a member of a country club or any other private organization—we can include anyone that we want and we can exclude anyone that we chose to exclude. We can do whatever we want to do. If you really believe that you can write down a list of objectives and then go about doing those things and checking them off the list in order to become a partner, then you are sadly mistaken. There are no objectives. It's all subjective. We can do whatever we want. You had better think about how you can win more fans around this place and humble yourself appropriately."

56. V&E employs only subjective criteria—without any objective standards—for partnership decisions.

57. The aforementioned comments and actions demonstrate that Plaintiff's race (African-American) and gender (female) were motivating factors in Defendant V&E's refusal to promote Plaintiff to partner.

58. Mr. Harvin and other V&E partners encouraged Plaintiff to look for another job. Likewise, Mr. Harvin, Mr. Schick, Mr. Walton, and Mr. Dilg all informed Plaintiff that it was unlikely that she would ever become a partner at V&E.

59. Plaintiff suffered extreme mental and emotional distress and was forced to seek professional counseling.

60. The conduct and actions of partners at V&E made it clear that Plaintiff could no longer continue to work there. Plaintiff provided her resignation to Mr. Dilg on or about March 24, 2003.

## V.
## COUNT I: RACE DISCRIMINATION

61. Paragraphs 1 through 60 are incorporated as though fully set forth herein.

62. Defendant V&E intentionally engaged in unlawful employment practices involving Plaintiff because of her race (African-American) in violation of 42 U.S.C. § 1981.

63. Defendant V&E also violated Plaintiff's rights under 42 U.S.C. § 1981.

64. Defendant V&E intentionally discriminated against Plaintiff in connection with the compensation, terms, conditions and privileges of employment or limited, segregated or classified Plaintiff in a manner that would deprive or tend to deprive her of any employment opportunity or adversely affect her status because of her race in violation of 42 U.S.C. § 1981.

65. Defendant V&E intentionally classified Plaintiff in a manner that deprived her of an equal employment opportunity that was provided to employees similarly situated in violation of 42 U.S.C. § 1981.

66. Plaintiff is an African-American female, and Defendant V&E discriminated against her on the basis of race with malice or with reckless indifference to her protected rights.

67. Plaintiff suffered damages for which Plaintiff sues herein.

## VI.
## COUNT II: CONSTRUCTIVE DISCHARGE

68. Paragraphs 1 through 67 are incorporated as though fully set forth herein.

69. Defendant V&E made the working conditions so intolerable that Plaintiff felt compelled to resign her position. A reasonable person in the same position would have also felt compelled to resign.

70. Plaintiff suffered damages for which Plaintiff sues herein.

## VII.
## COUNT III: RETALIATION

71. Paragraphs 1 through 70 are incorporated as though fully set forth herein.

72. Defendant V&E instituted a campaign of retaliation against Plaintiff that included failing to promote her to partner.

73. This retaliation was and is due to Plaintiff exercising her rights by opposing a discriminatory practice. Further, this retaliation was and is due to Plaintiff's race (African-American).

74. Plaintiff suffered damages for which Plaintiff sues herein.

## VIII.
## DAMAGES

75. Plaintiff sustained the following damages as a result of the actions and/or omissions of Defendant V&E described hereinabove:

a. Loss of income;

b. All reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff;

c. Back pay from the date that Plaintiff was denied a promotion;

d. All reasonable and necessary costs;

e. Emotional pain;

f. Expert fees as the Court deems appropriate;

g. Front pay in an amount that is equitable and just to make Plaintiff whole;

h. Inconvenience;

i. Prejudgment interest;

j. Mental anguish in the past;

k. Mental anguish in the future;

l. Loss of earnings in the past;

m. Loss of earning capacity which will, in all probability, be incurred in the future; and

n. Loss of benefits.

## IX.
## EXEMPLARY DAMAGES

76. Plaintiff would further show that the acts and omissions of Defendant V&E complained of herein were committed with malice or reckless indifference to the protected rights of Plaintiff. In order to punish Defendant V&E for engaging in unlawful business practices and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant V&E for exemplary damages.

## X.
## INJUNCTIVE RELIEF

77. Plaintiff further seeks injunctive relief arising out of the actions and/or omissions of Defendant V&E described hereinabove. Plaintiff requests that the Court prohibit Defendant by injunction from engaging in unlawful employment practices.

## XI.
## JURY DEMAND

78. Plaintiff demands a trial by jury.

## XII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Rhonda H. Wills, respectfully prays that Defendant Vinson & Elkins L.L.P. be cited to appear and answer herein, and that following a trial by jury of the cause, judgment be rendered for Plaintiff against Defendant for damages in an amount within the jurisdictional limits of the Court; exemplary damages, together with interest as allowed by law; attorney's fees and costs of court; and such other and further relief to which Plaintiff may be entitled at law or in equity.

Respectfully submitted,

By: ______________________________

Broadus A. Spivey
State Bar No. 00000076
SPIVEY & AINSWORTH, P.C.
48 East Avenue
Austin, Texas 78701
512/474-6061 [Telephone]
512/474-1605 [Facsimile]